RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0220p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

MICHAEL L. SCOTT; LINDA A. LARKIN,

                *Plaintiffs-Appellants*,

    *v.*

FIRST SOUTHERN NATIONAL BANK,

                *Defendant-Appellee*.

No. 18-6130

───────────────

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 5:16-cv-00281—Karen K. Caldwell, Chief District Judge.

Argued: August 9, 2019

Decided and Filed: August 29, 2019

Before: CLAY, LARSEN, and READLER, Circuit Judges.

───────────────

## COUNSEL

───────────────

**ARGUED:** Richard A. Getty, THE GETTY LAW GROUP, PLLC, Lexington, Kentucky, for Appellants. Robert C. "Coley" Stilz III, KINKEAD & STILZ, PLLC, Lexington, Kentucky, for Appellee. **ON BRIEF:** Richard A. Getty, Danielle Harlan, THE GETTY LAW GROUP, PLLC, Lexington, Kentucky, for Appellants. Robert C. "Coley" Stilz III, KINKEAD & STILZ, PLLC, Lexington, Kentucky, Stanton L. Cave, LAW OFFICE OF STAN CAVE, Lexington, Kentucky, for Appellee.

───────────────

## OPINION

───────────────

CLAY, Circuit Judge. Plaintiffs Michael L. Scott and Linda A. Larkin filed a five count

Complaint in state court against Defendant First Southern National Bank ("First Southern") after

First Southern failed to extend additional loans to finance Plaintiffs' commercial renovation project. First Southern removed the action to federal district court, properly invoking federal question jurisdiction, *see* 28 U.S.C. §§ 1331 and 1441, for Plaintiffs' claims under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq.*, and supplemental jurisdiction over Plaintiffs' related state common law claims, *see* 28 U.S.C. § 1367. After discovery, First Southern moved for summary judgment on all claims. In response, Plaintiffs filed a motion for partial summary judgment on their claim that First Southern breached its duty of good faith and fair dealing. The district court granted First Southern's motion for summary judgment, denied Plaintiffs' motion for partial summary judgment, and entered judgment in favor of First Southern. Plaintiffs filed this timely appeal.

For the reasons provided below, we **AFFIRM** the district court.

## I. BACKGROUND

### A. Factual History

Plaintiffs own two dental practices, several LLC's that own properties that Plaintiffs use to generate rental income, a sports bar, and an indoor basketball gymnasium that they also rent out as an event center. Around 2009, Scott began "buying property" that he "could rehab" because "it was a great time to buy . . . especially in Cincinnati." (Scott Dep., ECF No. 66-2 at PageID #322.) To further his property-investment efforts, Scott obtained a $300,000 commercial line of credit ("Credit Line") from First Southern.

Scott had previously taken out several loans from First Southern, including a home equity loan, a line of credit, and a construction loan. From his prior dealings with First Southern, Scott knew that First Southern went through a "process" before it "len[t] money or renew[ed] notes to approve people for loans." (*Id.* at 316.) Scott knew that this process entailed "collect[ing] . . . financial information about the borrower" through "[p]ersonal financial statements" and "credit reports" and gathering "information about the collateral that's going to be pledged." (*Id.* at 317.) And Scott understood that First Southern evaluated this financial information before deciding whether to approve a borrower for a loan.

In June 2013, Scott sought a loan from First Southern to convert a vacant former hotel into 26 apartment units and two commercial spaces. To support his loan request, Scott provided First Southern with a total cost estimate of $941,793.32 for the renovation. Scott submitted the cost estimate to Rocky Mason, the Community President of First Southern's Lexington branch who managed Plaintiffs' accounts at First Southern. Scott and Mason also communicated about the loan request via text message, discussing, among other things, the terms of the potential loan, the bank's appraisal of Scott's collateral, and the bank's valuation of the renovation project.

After First Southern received the cost estimates for the renovation project from Scott, First Southern followed its usual process for reviewing a request for a sizable loan. An analyst from First Southern evaluated Plaintiffs' financial statements, three years of Plaintiffs' tax returns, and Plaintiffs' credit report. The analyst compiled Plaintiffs' financial information into a "loan presentation" that was submitted to First Southern's Executive Loan Committee. After reviewing the loan presentation, the Executive Loan Committee approved Plaintiffs' loan request.

On July 23, 2013, Plaintiffs and First Southern executed a Commercial Loan Agreement through which Frist Southern extended Plaintiffs a commercial loan for the renovation project ("Construction Loan"). The Commercial Loan Agreement provided that the "maximum total principal balance" for the Construction Loan "will not exceed $1,013,519.00." (Loan Agreement, ECF No. 66-11 at PageID #582.) The Commercial Loan Agreement, by its terms, represented "the complete and final expression of the understanding between" Plaintiffs and First Southern, provided that it could "not be amended or modified by oral agreement," and stated that "[n]o amendment or modification . . . is effective unless made in writing and executed" by Plaintiffs and First Southern. (*Id*. at PageID #587.)

While the Commercial Loan Agreement did not contain any promise that First Southern would extend additional loans to Plaintiffs, Scott believed that First Southern would loan him any extra funds needed to complete the renovation. According to Scott, he and Mason had discussed the possibility of cost overruns before Plaintiffs and First Southern entered into the Commercial Loan Agreement; Mason understood that overruns were likely and told Scott that because of Scott's longstanding relationship with First Southern, Mason "d[id]n't see [Scott]

having any problems" obtaining additional financing. (Scott Dep., ECF No. 66-2 at PageID #336.) Scott asserts that Mason "represented [that] the project was going to be finished." (*Id.* at PageID #345.) Scott states that he relied on Mason's assurances that Scott could obtain additional funding in deciding to finance the project through First Southern rather than through a different lending institution.

In early November 2013, Scott informed Mason via text message that Plaintiffs would likely need an additional $400,000 to complete the renovation. Scott asked Mason to "let me know as soon as possible" if First Southern "cannot do" the additional loan because Scott could "get it from PNC" instead. (Text Messages, ECF No. 66-7 at PageID #533.) In response, Mason asked Scott to provide a "breakdown" for the additional $400,000 Scott might request. (*Id.*) Scott stated that he would have the architect for the renovation project explain to Mason the reasons for requesting the additional funds.

On November 9, 2013 and November 27, 2013, the architect provided Mason with revised bids for certain individual components of the renovation. But the architect did not provide an updated estimate of the total cost to complete the project. On January 10, 2014, Mason emailed Scott, "[i]f you will need more funds, we will need to gather an estimate of what it will cost to complete soon." (ECF No. 77-14 at PageID #1195.) On February 21, 2014, the architect provided First Southern with an updated cost estimate for the entire renovation project. The revised total estimated cost was $1,654,648.65, i.e., approximately $712,000 above the total cost for the project that Plaintiffs had represented in their loan application and approximately $640,000 more than First Southern had loaned Plaintiffs.

The following week, Mason and Scott met in Cincinnati. Mason states that Scott requested that First Southern loan Plaintiffs an additional $650,000; that Mason requested that Scott present additional collateral to support his new loan request; and that Scott refused to offer additional collateral. Scott states that Mason never asked that Scott provide additional collateral. Scott also asserts that additional collateral was not needed because he was already "overcollateralized" on his loans with First Southern. (Scott Dep, ECF No. 66-2 at PageID #358.) A few days after their meeting, Scott texted Mason to "try [his] best to get the whole amount" of the additional funds that Scott had requested. (ECF No. 66-7 at PageID #539.)

Mason initiated the process of reviewing Scott's new loan request.  This process involved obtaining itemized cost breakdowns from the architect, assembling Plaintiffs' updated financial information, running new credit checks on Plaintiffs, and ultimately seeking approval of a new loan from First Southern's Executive Loan Committee.  When compiling this updated information, an analyst from First Southern discovered that Plaintiffs had incurred additional debt in the period since First Southern had approved the Construction Loan and that Plaintiffs had failed to disclose this new debt to Frist Southern.  After conducting an investigation, First Southern learned that Plaintiffs had obtained approximately $600,000 in loans from United Bank to purchase and renovate a gymnasium.

After Mason learned about Plaintiffs' additional debt burden, Mason spoke with members of the Executive Loan Committee.  According to John Ball, one of the members of the Executive Loan Committee, the Committee determined that the loans Scott had received from United Bank "increase[d] leverage and [Scott's] debt position."  (Ball Dep., ECF No. 66-8 at PageID #562.) The Executive Loan Committee also believed that the renovation project had a "tremendous amount of [cost] overrun."  (*Id.* at PageID #562.)  For these reasons, the Executive Loan Committee "didn't feel like it was a safe and sound loan" and denied Scott's request for additional financing.  (*Id.*)  On March 31, 2014, Mason called Scott and informed him that First Southern had denied Scott's additional loan request.[1]

Plaintiffs' Credit Line with First Southern was scheduled to mature on June 24, 2014. On June 17, 2014, First Southern notified Plaintiffs that because Plaintiffs' request to renew the Credit Line was still pending, First Southern would not require Plaintiffs to repay the balance of the Credit Line when it became due; instead, until First Southern rendered an ultimate determination about whether to renew the Credit Line, First Southern would only require that Plaintiffs continue to make interest payments.

---

[1]Later that day, Scott texted Mason, "[n]o hard feelings on the loan.  Business is business.  I like u as a person and we both know that is all that matters in life.  Your daughter is more than welcome to come to the office anytime.  Good people know good people.  U and Shelia r good people.  Thanks bro."  (ECF No. 66-7 at PageID #540.)

Unlike in previous years, First Southern failed to extend the Credit Line's maturity date during this review period. Because First Southern's computer system still listed the maturity date for the Credit Line as June 24, 2014, the computer system generated automated delinquency reports that it transmitted to the credit bureaus in July and August 2014, damaging Plaintiffs' credit score. First Southern admits that its computer system sent delinquency notices to the credit bureaus but asserts that these notices were proper because Plaintiffs were in fact delinquent; Plaintiffs had failed to pay off the loan balance by the maturity date or make the required interest payments in July and August 2014.

After First Southern denied his loan request, Scott applied for financing from United Bank. United Bank loaned Scott $2,040,000. Using the financing he had received from United Bank, Scott completely payed off the Construction Loan and Credit Line with First Southern in early September 2014. Scott also used the loan from United Bank to complete the renovation project.

Even after Scott paid off his debts with First Southern, First Southern's automated computer system continued to report Scott's entire prior payment history, including the fact that he had previously been delinquent on his loans. In early October 2014, Scott discovered that First Southern had reported damaging information to the credit bureaus after Clarion Financial, which regularly provided Plaintiffs credit to purchase dental supplies, denied Plaintiffs' latest credit request because Plaintiffs' credit report showed that Plaintiffs had previously been delinquent on their loans with First Southern. After Scott contacted Mason, Mason checked the status of Scott's loans and reported to Scott that First Southern's system indicated that Scott was "current." (ECF No. 66-7 at PageID #548.) Mason texted Scott that "we will work to straighten [the situation] out immediately." (*Id.*) Scott asserts that he did not contact the credit bureaus to complain about the reporting error because Mason had assured him that First Southern would take care of the issue.

In October 2014, First Southern submitted amendments to the national credit reporting bureaus informing them that Plaintiffs had paid off their loans with First Southern and were no longer delinquent. Mason's assistant, Shelia Myers, emailed Scott and informed him that "Equifax acknowledged receipt of our requested change" to Plaintiffs' payment history.

(Myers Email, ECF No. 77-32 at PageID #1242.)  Myers also stated that she had recently spoken with First Southern's loan administrator and that he believed that Equifax's having confirmed receipt of the amendment "should suffice in knowing the error had been corrected" and that Scott should "NOT . . . pull a credit report just to confirm the correction" because "each time a report is pulled, the credit score lowers a bit." (*Id.*)

In March 2015, Plaintiffs' lawyer sent First Southern a letter complaining about First Southern's "erroneous reporting" to the credit bureaus and the financial and reputational damage it caused Plaintiffs.  The letter also alleged that First Southern deliberately provided the credit bureaus with false and damaging information about Plaintiffs' payment history in retaliation for Plaintiffs financing the basketball gymnasium project through United Bank.  In June 2015, Plaintiffs' lawyer sent First Southern another letter that alleged continued harms to Plaintiffs because of First Southern's erroneous reporting.  Both letters stated that Plaintiffs were suffering harms because of First Southern's past erroneous reporting.  Neither letter alleged that First Southern continued to provide inaccurate information to the credit bureaus.

Despite First Southern's representation in October 2014 that the reporting issue had been remedied, the credit bureaus continued to report the delinquency on Plaintiffs' credit report. In fact, First Southern had reported to TransUnion that Plaintiffs were delinquent in September, October, and November of 2014, even though Plaintiffs had paid off the entire balance of their loans in early September.  On August 20, 2015, Plaintiffs' attorney sent First Southern a letter stating that Plaintiffs had received a credit report earlier that week that continued to show delinquencies from September, October, and November of 2014 based on Plaintiffs' previous accounts with First Southern.  On September 11, 2015, First Southern submitted a second amendment to the national credit bureaus to correct the erroneous information that First Southern had previously provided stating that Plaintiffs were delinquent.  First Southern's second amendment notice remedied the erroneous delinquency reports; during his deposition, Scott stated that any credit issue he had previously experienced because of First Southern's inaccurate reporting had been "resolved." (Scott Dep., ECF No. 66-2 at PageID #388.)

**B. Procedural History**

Plaintiffs filed a five-count Complaint, asserting that First Southern: violated the FCRA by willfully and/or negligently failing to fully and timely investigate Plaintiffs' complaints that First Southern had inaccurately reported Plaintiffs' payment history to the credit bureaus (Counts I and II); beached its duty of good faith and fair dealing and tortiously interfered with Plaintiffs' business relationships by deliberately reporting false information to the credit bureaus in retaliation for Plaintiffs' financing the gymnasium project through United Bank (Counts III and V); and made fraudulent misrepresentations that First Southern would loan Plaintiffs additional funds as necessary to complete the renovation (Count IV). First Southern moved for summary judgment on all of Plaintiffs' claims. Plaintiffs filed a cross-motion for partial summary judgment on their claim that First Southern breached its duty of good faith and fair dealing. The district court granted First Southern's motion for summary judgment, denied Plaintiffs' cross-motion for partial summary judgment, and entered judgment for First Southern. This timely appeal followed.

## II. STANDARD OF REVIEW

"[T]his Court reviews a district court's grant of summary judgment *de novo*." *Rd. Sprinkler Fitters Local Union No. 669, U.A., AFL-CIO v. Dorn Sprinkler Co.*, 669 F.3d 790, 793 (6th Cir. 2012) (citing *Trs. of Resilient Floor Decorators Ins. Fund v. A & M Installations, Inc.*, 395 F.3d 244, 247–48 (6th Cir. 2005)).

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *Smith v. Perkins Bd. of Educ.*, 708 F.3d 821, 825 (6th Cir. 2013) (quoting *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 551 (6th Cir. 2002)). When evaluating a motion for summary judgment, the court must "view[] [the evidence] in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted). Further, "all reasonable inferences must be made in favor of the non-moving party." *Moran v. Al Basit LLC*,

788 F.3d 201, 204 (6th Cir. 2015) (citing *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000)). The moving party bears the burden of showing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25 (1986).

## III. DISCUSSION

### A. FCRA Claims

Plaintiffs argue that the district court improperly granted First Southern summary judgment on Plaintiffs' FCRA claims. Plaintiffs concede that they "did not notify the credit bureaus of the false reports submitted to them by [First Southern]." (Pls.' Br. at 32.) But Plaintiffs maintain that they would have notified the credit bureaus but-for Mason's representation that First Southern would "take care" of the inaccurate reporting of Plaintiffs' payment history and Myers' recommendation that Plaintiffs not pull a credit report to confirm that the reporting error had been remedied. (*Id.* at 32–33.) Plaintiffs assert that the district court violated principles of justice and contravened the consumer-protection purposes of the FCRA by granting summary judgment to First Southern on Plaintiffs' FCRA claims. In response, First Southern argues that Plaintiffs failed to trigger First Southern's obligations under the FCRA because Plaintiffs never filed a dispute with a consumer reporting agency.

As explained below, the district court properly granted First Southern's motion for summary judgment on Plaintiffs' FCRA claims. Plaintiffs never notified a consumer reporting agency about their dispute, a prerequisite for prevailing on their FCRA claims.

#### 1. Relevant Legal Principles

"Under the FCRA, those who furnish information to consumer reporting agencies have two obligations: (1) to provide accurate information; and (2) to undertake an investigation upon receipt of a notice of dispute regarding credit information that is furnished." *Downs v. Clayton Homes, Inc.*, 88 F. App'x 851, 853 (6th Cir. 2004); *see* 15 U.S.C. § 1681s–2. The FCRA "creates a private right of action" for consumers to enforce the requirement under § 1681s–2(b) that furnishers of information investigate upon receiving notice of a dispute, but not the requirement under § 1681s–2(a) that furnishers of information initially provide accurate

information to consumer reporting agencies. *Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611, 615 (6th Cir. 2012).

This Court has repeatedly held that consumers must file a dispute with a consumer reporting agency to trigger the furnisher's duty to investigate under § 1681s–2(b). *See, e.g.*, *Merritt v. Experian*, 560 F. App'x 525, 528–29 (6th Cir. 2014) ("'Furnishers' of information to consumer reporting agencies do have certain responsibilities to investigate [under the FCRA]— but *only after* receiving a request from a consumer reporting agency to respond to a dispute.") (emphasis added); *Boggio*, 696 F.3d at 615–16 (holding that "consumers may step in to enforce their rights *only after* a furnisher has received proper notice of a dispute from a [credit reporting agency]") (emphasis added); *Brown v. Wal-Mart Stores, Inc.*, 507 F. App'x 543, 547 (6th Cir. 2012) ("A private cause of action against a furnisher of information does not arise until a consumer reporting agency provides proper notice of a dispute."); *see also Downs*, 88 F. App'x at 853–54 (explaining that to implicate § 1681s–2(b)'s duty that a furnisher of information conduct an investigation "the plaintiff must show that the furnisher received notice from a consumer reporting agency.").

A consumer's complaining directly to a furnisher of information about a purported error in the information the furnisher supplied to a consumer reporting agency does not trigger the furnisher's duty to investigate under the FCRA. *See, e.g.*, *Brown*, 507 F. App'x at 547 ("Directly contacting the furnisher of credit information does not actuate the furnisher's obligation to investigate a complaint.") (citing *Nelson v. Chase Manhattan Mortg. Corp.*, 282 F.3d 1057, 1060 (9th Cir. 2002)); *Downs*, 88 F. App'x at 853–54 (explaining that "the plaintiff must show that the furnisher received notice from a consumer reporting agency, not the plaintiff, that the credit information is disputed").

## 2. Application to the Matter at Hand

The district court correctly granted summary judgment to First Southern on Plaintiffs' FCRA claims. Because Plaintiffs never filed a dispute with a consumer reporting agency, First Southern's duty to investigate under § 1681s–2(b) was never activated. *See, e.g.*, *Merritt*, 560 F. App'x at 528–29; *Boggio*, 696 F.3d at 615–16; *Brown*, 507 F. App'x at 547; *Downs*, 88 F. App'x

at 853–54.  Plaintiffs' notifying First Southern directly about the errors in the information that First Southern had furnished to the consumer reporting agencies failed to trigger First Southern's duty to investigate.  *See, e.g.*, *Brown*, 507 F. App'x at 547 (citing *Nelson*, 282 F.3d at 1060); *Downs*, 88 F. App'x at 853–54.  Therefore, the district court properly granted summary judgment in favor of First Southern on Plaintiffs' FCRA claims.

Plaintiffs do not assert any legal arguments for why the district court erred by dismissing their FCRA claims.  Rather, Plaintiffs rely exclusively on a policy argument.  Plaintiffs contend that by dismissing their FCRA claims despite Mason's representation that First Southern would remedy the problem with Plaintiffs' payment history and Myers' admonition that Plaintiffs' not generate a credit report to confirm that the problem had been remedied, the district court allowed First Southern to "have its cake and eat it too," in contravention of the pro-consumer purposes of the FCRA.  (Pls.' Br. at 33.)  Plaintiffs fail to appreciate that the FCRA protects both consumers and furnishers.  For instance, this Court has explained that while the FCRA "provides consumers with a private remedy against negligent or willful misconduct by a furnisher . . . it simultaneously protects furnishers from answering frivolous consumer disputes."  *Boggio*, 696 F.3d at 616; *see also Nelson*, 282 F.3d at 1060 (describing the FCRA's reporting requirement as "a filtering mechanism" that protects furnishers of information from frivolous consumer complaints).  One way that the FCRA protects furnishers is by requiring that a consumer file a dispute with a consumer reporting agency, and that the consumer reporting agency screen the complaint and provide notice of the dispute to a furnisher if warranted, before the consumer may assert a private right of action against the furnisher.  *See Boggio*, 696 F.3d at 614–16.  Accordingly, Plaintiffs' argument is unpersuasive.[2]

---

[2]Plaintiffs' most promising avenue to attempt to avoid application of the FCRA's notice requirement may have been through the doctrine of equitable estoppel.  This Circuit has held that equitable estoppel can bar a defendant from raising an affirmative defense, *see E.E.O.C. v. Kentucky State Police Dep't*, 80 F.3d 1086, 1095 (6th Cir. 1996), and, in some instances, from contesting an element of a plaintiff's claim, *see Thomas v. Miller*, 489 F.3d 293, 302 (6th Cir. 2007).  This Circuit has never decided whether equitable estoppel could prevent a defendant from asserting that a plaintiff failed to satisfy the FCRA's notice requirement.

Because Plaintiffs never raised an equitable estoppel argument, we do not decide at present whether, in appropriate circumstances and if properly raised, a furnisher of consumer credit information could be equitably estopped from arguing that the plaintiff failed to file a dispute with a consumer reporting agency.

### 3. Summary

We find that the district court properly granted summary judgment in favor of First Southern on Plaintiffs' FCRA claims.

### B. Claims for Breach of the Duty of Good Faith and Fair Dealing and Tortious Interference with Contractual Relationships

Plaintiffs assert that the district court erroneously held that the FCRA preempts state common law claims. Plaintiffs further assert that the district court improperly dismissed Plaintiffs' claims for breach of the duty of good faith and fair dealing and tortious interference with contractual relationships because First Southern deliberately harmed Plaintiffs' credit score by not extending the maturity date on the LOC and by allowing its computer system to send false delinquency notices to the credit bureaus. In response, First Southern argues that the district court correctly held that the FCRA preempts state common law claims that concern a furnisher's transmission of information to consumer reporting agencies. First Southern asserts that because Plaintiffs' claims arise from First Southern's reporting obligations, the district court properly dismissed Plaintiffs' claims as preempted by the FCRA.

As explained below, the district court correctly concluded that the FCRA preempts state common law claims involving a furnisher's reporting of information to consumer reporting agencies. Further, the district court correctly found that the FCRA preempts Plaintiffs' claims of breach of the duty of good faith and fair dealing and tortious interference with contractual relationships because these claims relate to First Southern's reporting obligations.

### 1. Relevant Legal Principles

The FCRA provides that "[n]o requirement or prohibition may be imposed under the laws of any State . . . with respect to any subject matter regulated under . . . section 1681s-2 of this title, relating to the responsibilities of persons who furnish information to consumer reporting agencies[.]" 15 U.S.C. § 1681t(b)(1)(F). This Court has held that the FCRA preempts state common law claims. *Ellen Sparks v. Countrywide Homes Loans, Inc., et al.*, No. 15-6330, slip op. at 3 (6th Cir. Sep. 2, 2016) (per curiam) (holding that the FCRA preempted the plaintiff's common law negligence claim arising from the defendants' furnishing of information to credit

reporting agencies); *see also Lloyd v. Midland Funding, LLC*, 639 F. App'x 301, 307 (6th Cir. 2016) (explaining that the FCRA would preempt plaintiffs' common law claims if said claims "rel[ied] on the proposition that [the defendant] was a furnisher of information" under the FCRA).   The other Courts of Appeals that have addressed whether the FCRA preempts state common law claims have also answered the question in the affirmative.  *See, e.g.*, *Macpherson v. JPMorgan Chase Bank, N.A.*, 665 F.3d 45, 47–48 (2d Cir. 2011); *Purcell v. Bank of Am.*, 659 F.3d 622, 625–26 (7th Cir. 2011).

### 2.  Application to the Matter at Hand

The district court correctly held that the FCRA preempts Plaintiffs' common law claims of breach of the duty of good faith and fair dealing and tortious interference with contractual relationships.   Plaintiffs' common law claims arise from First Southern's reporting incorrect information to the credit bureaus.  Because these common law claims concern the same "subject matter regulated under . . . section 1681s-2 of [the FCRA]," *see* § 1681t(b)(1)(F), they are preempted by the FCRA.  *See Sparks*, No. 15-6330, slip op. at 3; *Macpherson*, 665 F.3d at 47–48; *Purcell*, 659 F.3d at 625–26; *see also Lloyd*, 639 F. App'x at 307.  The fact that Plaintiffs' claims arise under state common law, rather than state statutory law, does not save them from preemption.

Plaintiffs rely on a district court case from the Western District of Kentucky to argue that the FCRA preempts only state statutory claims.  *See Miller v. Wells Fargo & Co.*, No. 3:05-CV-42-S, 2008 WL 793676, at *8 (W.D. Ky. Mar. 24, 2008).  The district court in *Miller* perceived a "tension" between § 1681t(b)(1)(F) and § 1681h(e), the FCRA's two preemption provisions, because § 1681h(e) "preempts state law claims for defamation, invasion of privacy, and negligence, to the extent that the plaintiff cannot prove the defendant acted with malice or willful intent to injure" while § 1681t(b)(1)(F), enacted twenty-six years later, "prohibits *all* state claims against furnishers."  *Id.* at *7 (emphasis added).  The *Miller* court believed that reconciling this tension required adopting what some district courts have referred to as the "statutory approach," that is, holding that the FCRA preempts state statutory claims but not state common law claims.  *Id.* a *10.

While a handful of district courts have followed the "statutory approach," the two Courts of Appeals that have addressed the issue both explicitly rejected the "statutory approach" and held that the FCRA preempts state common law claims. In *Purcell*, 659 F.3d 622, the Seventh Circuit explained why § 1681t(b)(1)(F) and § 1681h(e) are not in conflict,

> Unlike these judges, we do not perceive any inconsistency between the two statutes. Section 1681h(e) preempts some state claims that could arise out of reports to credit agencies; § 1681t(b)(1)(F) preempts more of these claims. Section 1681h(e) does not create a right to recover for wilfully false reports; it just says that a particular paragraph does not preempt claims of that stripe. Section 1681h(e) was enacted in 1970. Twenty-six years later, in 1996, Congress added § 1681t(b)(1)(F) to the United States Code. The same legislation also added § 1681s–2. The extra federal remedy in § 1681s–2 was accompanied by extra preemption in § 1681t(b)(1)(F), in order to implement the new plan under which reporting to credit agencies would be supervised by state and federal administrative agencies rather than judges. Reading the earlier statute, § 1681h(e), to defeat the later-enacted system in § 1681s–2 and § 1681t(b)(1)(F), would contradict fundamental norms of statutory interpretation.

> Our point is not that § 1681t(b)(1)(F) repeals § 1681h(e) by implication. It is that the statutes are compatible: the first-enacted statute preempts some state regulation of reports to credit agencies, and the second-enacted statute preempts more. There is no more conflict between these laws than there would be between a 1970 statute setting a speed limit of 60 for all roads in national parks and a 1996 statute setting a speed limit of 55. It is easy to comply with both: don't drive more than 55 miles per hour. Just as the later statute lowers the speed limit without repealing the first (which means that, if the second statute should be repealed, the speed limit would rise to 60 rather than vanishing), so § 1681t(b)(1)(F) reduces the scope of state regulation without repealing any other law. This understanding does not vitiate the final words of § 1681h(e), because there are exceptions to § 1681t(b)(1)(F). When it drops out, § 1681h(e) remains. But, even if our understanding creates some surplusage, courts must do what is essential if the more recent enactment is to operate as designed.

*Purcell*, 659 F.3d at 625. In a decision issued shortly after *Purcell*, the Second Circuit followed the Seventh Circuit's conclusion that "§ 1681h(e) is compatible with § 1681t(b)(1)(F)" and held that state common law claims "are preempted by the plain language of § 1681t(b)(1)(F)." *Macpherson*, 665 F.3d at 48 (explaining that "the operative language in § 1681h(e) provides only that the provision does not preempt a certain narrow class of state law claims; it does not prevent the later-enacted § 1681t(b)(1)(F) from accomplishing a more broadly-sweeping preemption.")

We follow the prior decisions from this Circuit and the other Courts of Appeals that have decided the issue and hold that the FCRA preempts both state statutory and state common law claims.  As the Second Circuit held in *Macpherson*, the plain language of § 1681t(b)(1)(F) preempts all state "laws" without distinguishing between state statutory law and state common law.  *See Bates v. Dura Auto. Sys., Inc.*, 625 F.3d 283, 285 (6th Cir. 2010) ("When we can discern an unambiguous and plain meaning from the language of a statute, our task is at an end.") (quoting *Bartlik v. U.S. Dep't of Labor*, 62 F.3d 163, 166 (6th Cir. 1995) (internal quotation marks omitted)).  Based on its plain language, § 1681t(b)(1)(F) preempts state common law claims.**3**

Like the Seventh Circuit in *Purcell* and the Second Circuit in *Macpherson*, we conclude that the FCRA's preemption provisions are not in conflict.  Congress implemented § 1681h(e) as part of the first iteration of the FCRA.  When Congress amended the FCRA in 1996, Congress decided to impose additional duties on furnishers (as codified in § 1681s–2) and, as part of the modified statutory scheme, also decided to preempt additional state law claims (through § 1681t(b)(1)(F)).  There is nothing remarkable about Congress changing the scope of federal preemption of state law when it refines a previously-enacted statutory scheme.  *See, e.g.*, *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 520 (1992) (describing the preemption provision in the Public Health Cigarette Smoking Act of 1969 ("PHCSA") as "much broader" than the preemption provision in the 1965 version of the PHCSA).  Further, as the Seventh Circuit explained in *Purcell*, "courts do not read old statutes to defeat the operation of newer ones." *Purcell*, 659 F.3d at 626.  But accepting Plaintiffs' argument that the FCRA's original preemption provision, § 1681h(e), preserved state law claims governed by the plain language of the later-enacted preemption provision, § 1681t(b)(1)(F), "would defeat the 1996 decision [by Congress] that administrative action rather than litigation is the right way to deal with false reports to credit agencies." *Id.*

---

**3**Plaintiffs do not develop a textual argument that the word "laws" in § 1681t(b)(1)(F) refers only to state statutory laws as opposed to state common law.  But the Seventh Circuit persuasively rejected this argument in *Purcell*, holding that the word "laws" in § 1681t(b)(1)(F) applies to "all sources of legal rules" including "judicial decisions."  659 F.3d at 624 (citing *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 106–07 (2d Cir. 2009)).

The Supreme Court's decision in *Cipollone* further diminishes Plaintiffs' argument that this Court should adopt the "statutory approach" to the scope of preemption under the FCRA. In *Cipollone*, the Supreme Court held that by precluding "requirement[s] or prohibition[s] . . . imposed under State law," the PHCSA preempted state common law actions. 505 U.S. at 522–24. The relevant language in § 1681t(b)(1)(F) is nearly analogous to the language from the PHCSA at issue in *Cipollone*. And, like the PHCSA's preemption provision, § 1681t(b)(1)(F) preempts state common law claims.

### 3. Summary

The FCRA preempts state common law causes of action concerning a furnisher's reporting of consumer credit information to consumer reporting agencies. Plaintiffs' claims for breach of the duty of good faith and fair dealing and tortious interference with contractual relationships concern First Southern's reporting of Plaintiffs' credit information to consumer reporting agencies. Therefore, the district court correctly concluded that the FCRA preempts Plaintiffs' claims for breach of the duty of good faith and fair dealing and tortious interference with contractual relationships.

### C. Fraudulent Misrepresentation Claim

As an initial matter, we note that the FCRA does not preempt Plaintiffs' fraudulent misrepresentation claim. Plaintiffs assert that First Southern fraudulently represented to Plaintiffs that First Southern would loan additional funds to Plaintiffs as necessary to complete the renovation. Because Plaintiffs' fraudulent misrepresentation claim does not arise from First Southern's reporting obligations as a furnisher of consumer credit information, the FCRA does not preempt this claim. *See* § 1681t(b)(1)(F).

As explained below, Plaintiffs forfeited this issue on appeal because they failed to discuss the district court's reasoning for granting First Southern's motion for summary judgment on their fraudulent misrepresentation claim.

### 1. Relevant Legal Principles

In this Circuit, an appellant forfeits an argument that he fails to raise in his opening brief. *See, e.g.*, *In re Isaacs*, 895 F.3d 904, 917 (6th Cir. 2018) (citing *Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444, 462 (6th Cir. 2003)). Further, "where a plaintiff fails to address the district court's reasoning in disposing of a claim on summary judgment or motion to dismiss, we have deemed the claim forfeited." *Rees v. W.M. Barr & Co., Inc.*, 736 F. App'x 119, 124–25 (6th Cir. 2018) (collecting cases); *see also Grosswiler v. Freudenberg-Nok Sealing Techs.*, 642 F. App'x 596, 599 (6th Cir. 2016) (holding that plaintiffs abandoned their claim on appeal because they did not "challenge or even mention" one of the district court's bases for granting summary judgment).

### 2. Application to the Matter at Hand

Plaintiffs have forfeited their appeal of the district court's dismissal of their fraudulent misrepresentation claim. The district court held that Plaintiffs' fraudulent misrepresentation claim was barred by Kentucky's statute of frauds, K.R.S. § 371.010. Because the district court dismissed the claim under Kentucky's statute of frauds, it did not reach the merits of Plaintiffs' fraudulent misrepresentation claim. However, in their briefing before this Court, Plaintiffs do not address the district court's reasoning. Instead of arguing that the district court erred by finding that Kentucky's statue of frauds barred their fraudulent misrepresentation claim, Plaintiffs argue exclusively that the district court improperly dismissed this claim on the merits. Because Plaintiffs have failed to provide any argumentation concerning the district court's reasoning for dismissing their fraudulent misrepresentation claim, Plaintiffs have forfeited any challenge to the district court's disposition of this claim. *See, e.g.*, *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 311 (6th Cir. 2005); *Rees*, 736 F. App'x at 124.

### IV. CONCLUSION

For the above-stated reasons, we **AFFIRM** the district court.