[Cite as *Risner v. Ohio Dept. of Job & Family Servs.*, 2020-Ohio-609.]

| CHRISTOPHER RISNER | Case No. 2017-00533JD |
|---|---|
| Plaintiff | Magistrate Robert Van Schoyck |
| v. | DECISION OF THE MAGISTRATE |
| OHIO DEPARTMENT OF JOB AND FAMILY SERVICES | |
| Defendant | |

{¶1} Plaintiff brought this action to recover damages and attorney fees under the Fair Credit Reporting Act (FCRA), 15 U.S.C. 1681 et seq., claiming that defendant reported inaccurate information to a consumer credit reporting agency, Equifax, regarding his child support payment history for the months of November and December 2013, and February and May 2014. Plaintiff further claimed that when he disputed the information with Equifax, which in turn notified defendant, defendant failed to correct the information and instead maintained it was accurate. On April 8, 2019, the court issued a decision granting summary judgment in favor of defendant, in part, as to plaintiff's claims arising from the November 2013 and December 2013 information furnished to Equifax, and denying summary judgment, in part, as to plaintiff's claims arising from the February 2014 and May 2014 information furnished to Equifax. The case proceeded to trial.

**SUMMARY OF TESTIMONY**

{¶2} Plaintiff testified at trial that after he and his ex-wife separated in 2012, they reached an informal agreement under which they shared custody of their three children and he paid child support directly to her in the amount of $500 per month. When they finalized the dissolution of their marriage in 2013, plaintiff stated, their formal decree and settlement agreement provided that he would be responsible for paying the same amount of child support, plus processing charges, due the first day of each month

beginning April 1, 2013, to be administered by the Richland County Child Support Enforcement Agency (RCCSEA). (Defendant's Ex. C.) According to plaintiff, his attorney in that matter told him that the payments would be withheld from his wages and he would not have to make any payments himself. Plaintiff stated, though, that after the month of April 2013 passed without any withholding from his wages, he went to the RCCSEA office in person and sought guidance on May 1, 2013. Plaintiff testified that at the direction of the RCCSEA personnel, he made out a check in the amount of $500 and presented it on the spot.

{¶3} Plaintiff explained that after there continued to be no withholding from his wages during the month of May 2013 and he received a notice from RCCSEA that month notifying him that he was in default for having an arrearage of $500, he checked with his employer, the Gorman-Rupp Company, and came to learn that RCCSEA had mistakenly sent wage withholding notices to a similarly-named but separate company, the Gorman-Rupp Credit Union. Plaintiff explained that he discovered this problem on May 31, 2013, and later that day went to the RCCSEA office to address the matter. At the direction of the RCCSEA personnel, plaintiff stated, he made out a check in the amount of $510 and presented it on the spot, and after getting the information about his employer corrected, payments were thereafter automatically withheld from his wages.

{¶4} Plaintiff testified that several months later, in January 2014, he applied for a mortgage loan and was denied. Not knowing the reason for the denial, plaintiff stated, he obtained a copy of his Equifax credit report and discovered that it showed he owed defendant a past due balance. Plaintiff stated that he made a telephone call to RCCSEA in January 2014 after learning about the issue with his credit report and that he was told the problem related back to his payment obligation for the month of April 2013. Plaintiff described how he proceeded to lodge the first in a series of formal disputes with Equifax over the accuracy of the information it reported about his account with defendant, but that each time he did so Equifax would report back to him that

defendant had verified the information was reported accurately. Plaintiff spoke about several documents he obtained from Equifax between 2014 and 2018, including copies of his Equifax credit report and responses to some of the disputes that he initiated. (Plaintiff's Ex. 1.) Plaintiff testified that after his initial disputes failed to resolve the matter, he telephoned Equifax and received guidance on how to submit a written dispute letter containing more detail, which he did in November 2016, but again Equifax reported back that defendant had verified the information was reported accurately. (Id., pp. 6, 7.) Beyond the underlying past due balance that he disputes, plaintiff stated, in his view the credit report from 2015 onward also contained inaccurate or misleading language insofar as it included a comment stating: "Customer has now located consumer." (Id., pp. 3, 5, 8, 9.) By plaintiff's testimony, there was never a time when RCCSEA or defendant needed to find him, as he updated RCCSEA whenever his home address changed and he never tried to abscond from his child support obligations.

{¶5} Plaintiff testified that in addition to the disputes he initiated through Equifax, he also contacted RCCSEA again in April 2015 over the telephone to discuss the matter, as noted in RCCSEA's computer system. (Defendant's Ex. A, p. 1396.) Plaintiff also testified that in July 2016 he met with RCCSEA Director Janet Brock and a Richland County commissioner to discuss the matter, and an attorney for the county was also present for part of the meeting. Brock spent upwards of two hours with him going over his account history, plaintiff stated, trying to explain why the information was on his credit report. Plaintiff testified that Brock showed him the e-OSCAR system that she utilized when responding to credit report disputes so that he could see exactly what she saw. Plaintiff recounted that after the meeting he sent Brock an email to memorialize what they had discussed, but he did not receive a response and that was the last contact he had with RCCSEA.

{¶6} Plaintiff stated that his experience with the child support issue being on his credit report has probably been the most difficult thing he has ever dealt with in his life

and he has done everything he can to try to get it resolved. According to plaintiff, he has been asked about it when applying for mortgages or other large loans, he feels that he has lost job opportunities due to it, and he is afraid to apply for new jobs. Asked specifically about any lost job opportunities, plaintiff identified one instance where a prospective employer asked during an interview about the child support issue on his credit report, although he explained that he is constrained in what he can say about that matter because he signed a non-disclosure agreement during the application process. Plaintiff admitted that that prospective employer also asked about other matters on his credit report, including a bankruptcy and being delinquent on a mortgage. The child support issue is embarrassing for him to have to explain, plaintiff stated, as he is an involved parent and has always taken care of his children. It has made it tough to focus at work and has required him to incur legal fees, and it has caused problems in his relationship with his current wife, plaintiff stated.

{¶7} RCCSEA Director Janet Brock testified that child support enforcement in Ohio is managed by a statewide computer system known as the Support Enforcement Tracking System (SETS). When an individual becomes enrolled in SETS as a child support obligor or obligee, they are mailed an explanatory welcome letter, Brock stated, and she identified a copy of the letter that was mailed to plaintiff. (Defendant's Ex. E.) Among other things, the letter explained:

> **If you are an obligor**, you are responsible for making sure your support obligation is paid in full each month and you start owing the support upon the effective date of the support order. However, it can take as long as eight weeks before your employer begins deducting support from your wages. To avoid falling behind, make payments to Ohio Child Support Payment Central at the address below. You should do this until your employer starts withholding your full obligated support amount from your paycheck. If you are self employed, are laid off, or waiting for the income

withholding to begin, send your payments to: **Ohio Child Support Payment Central, P.O. Box 182372, Columbus OH 43218-2372.**

And, as Brock testified, the letter also included a "frequently asked questions" section setting forth information about what it means for an obligor to be in default and about the potential ramifications of being in default:

> Q. What does it mean to be "in default" of a support order and what can happen to me if I go into default?
>
> A. If you get behind at least one full month in support payments, you are in default. You will be sent a form outlining the enforcement remedies that may be taken. It is critical that you inform the CSEA of any address changes so that if you are issued a default letter, you can resolve your delinquent payments quickly. If not, resulting action by the CSEA can include reporting your arrearage to a credit-reporting agency which may affect your credit rating, suspending your driver's license, imposing a lien on your real and personal property, restricting and withdrawing from any account held by you at any financial institution, referring your support case to a collection agency, or proposing suspension of any professional license you hold. You are entitled to request an administrative hearing to determine whether the arrearage amount is correct and whether you are the correct person who owes the money.

Brock explained that an obligor who is behind one month in his or her child support obligation is considered to be in default; in the case of plaintiff's $500 monthly support obligation, default status would mean he owed $500 or more, according to Brock. Brock testified that once an obligor enters default status, SETS begins to automatically generate notices to the obligor, beginning with a "NOTICE TO OBLIGOR OF DEFAULT AND POTENTIAL ACTION" that is typically mailed to them about 15 days after they go

into default, notifying them of their default status, explaining potential action that may be taken against them, and outlining the process by which they may request that the county child support enforcement agency hold a hearing to contest the default determination. Brock identified a copy of a default notice that was sent to plaintiff, dated May 16, 2013, and, to her knowledge, RCCSEA received no response from plaintiff. (Defendant's Ex. F.) Brock stated that typically the next step is for a notice to be mailed to the obligor's employer. Brock also stated that a case worker from RCCSEA may contact the employer or take other action.

{¶8} According to Brock, eventually SETS will automatically report an obligor who is in default to a credit reporting agency such as Equifax. Brock stated that SETS will not report an obligor to a credit reporting agency if his or her arrearage does not rise to the level of default status. Within SETS a record is made of when an obligor is reported to a credit reporting agency, Brock stated, and from her review of the SETS records plaintiff was reported to Equifax on December 31, 2013, for owing $503.09. (Defendant's Ex. A, p. 1391.) Brock also explained that credit reporting agencies can access SETS such that, after an obligor is reported to the credit reporting agency, the agency's computer system will periodically review within SETS the status of the information that was reported.

{¶9} Brock testified that records reflect that plaintiff's ex-wife came to RCCSEA on February 4, 2014, and submitted an affidavit attesting that plaintiff had made direct payments to her in the amount of $430 and was current on his child support obligations. (Plaintiff's Ex. 3, p. 1392; Plaintiff's Ex. 4, p. 4; Defendant Ex. A, p. 1392.) As Brock explained, an RCCSEA case worker then made adjustments in SETS to deduct the $430 that plaintiff had owed to his ex-wife, but plaintiff still owed $73.09 in fees to RCCSEA which were not deducted. There is a standard two-percent processing fee charged to obligors each month, Brock explained, so in plaintiff's case, with his $500 monthly child support obligation, he owed RCCSEA a $10 fee each month, as spelled

out in his dissolution decree. (Defendant's Ex. C.) Brock testified that after plaintiff went into default, it was agency policy to redirect the monthly $10 fee toward paying down the arrearage owed to plaintiff's ex-wife, and after this happened for seven months the arrearage to the ex-wife had been reduced by $70, while the fee arrearage owed to RCCSEA grew to $73.09. As Brock noted, the Payment History Report for plaintiff's account shows that RCCSEA's $10 monthly fee went unpaid from July 2013 through January 2014. (Defendant's Ex. B.) Plaintiff's ex-wife could only forgive the amount owed to her, not the amount owed to RCCSEA, Brock stated.

{¶10} Brock testified that after the arrearage owed to plaintiff's ex-wife was deducted, he was no longer in default status. Brock explained, however, that the $73.09 arrearage owed to RCCSEA remained in SETS, and that when Equifax's computer system would periodically review SETS to check on the status of the information that had been reported on December 31, 2013, Equifax could see that plaintiff still owed $73.09. To the extent that plaintiff's Equifax credit report showed that he was in arrears in February and May 2014, Brock stated that he was indeed in arrears during those months. When asked about the Equifax credit report identifying plaintiff's account as being a "collection account," Brock testified that she does not know why Equifax identified it that way and that plaintiff was never reported to Equifax as being in collections. Brock stated that RCCSEA has not referred accounts to collection agencies in recent history. Brock also testified that she does not know why the Equifax credit report identifies plaintiff as having been "located," as she is not aware of there ever being any indication that he could not be located.

{¶11} When someone initiates a dispute through Equifax regarding information in their credit report, Equifax contacts defendant through a computer system known as e-OSCAR for verification that the information is accurate, Brock stated. According to Brock, inquiries through e-OSCAR are addressed by the respective county child support enforcement agencies and she personally reviews about ten such inquiries every

month. Brock, who stated that she has handled Equifax disputes for at least ten years for RCCSEA, testified that the information Equifax submits for verification through the e-OSCAR system can vary depending on the specific information that is in dispute, such as a name, Social Security number, or account past due, meaning that she would not necessarily be shown or asked to verify all information in a person's credit report pertaining to their child support account. Brock could not recall what information Equifax sent her through the e-OSCAR system in regard to the disputes plaintiff initiated through Equifax, but said she never had reason to believe any information had been misreported and, therefore, she verified the information about which Equifax inquired. Brock explained that when Equifax seeks verification of information through the e-OSCAR system, the information is only available for 120 days, so she cannot go back now and review the disputes that plaintiff initiated through Equifax.

{¶12} In 2015 or 2016, Brock recalled, at plaintiff's request she met with him in her office. Plaintiff had questions about his child support account and credit report, Brock stated. According to Brock, she showed plaintiff the process of using the e-OSCAR system to verify the information that he had disputed, and she attempted to explain to him how, in her determination, the information was correct.

{¶13} David Fleischman, who is employed with defendant as the Bureau Chief of Child Support, testified that he does not disagree with Brock's description of the default process. Fleischman was asked to explain how defendant calculates a "child support obligation," and he responded that it is the "total obligation" comprised of both the child support obligation and processing fees. Fleischman concurred with Brock that when an obligor is reported to a credit reporting agency, that is done automatically through SETS, which is administered by defendant. Fleischman stated that when someone initiates a dispute through Equifax regarding information in their credit report, Equifax uses the e-OSCAR system to request verification of the disputed information. According to Fleischman, the appropriate county child support enforcement agency

performs the e-OSCAR verification since child support cases are managed at the county level, and defendant's role is basically to monitor the timeliness of the county's response.

**LAW**

{¶14} "FCRA exists 'to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy.'" *Boggio v. USAA Fed. Savs. Bank*, 696 F.3d 611, 614 (6th Cir.2012), quoting *Safeco Ins. Co. v. Burr.*, 551 U.S. 47, 52 (2007). "FCRA imposes civil liability for willful or negligent noncompliance with its requirements * * *." *United States v. Bormes*, 568 U.S. 6, 8 (2012). "If noncompliance with a requirement is negligent, the affected consumer is entitled to recover actual damages as well as the costs of the action and reasonable attorney fees." *Ferron v. RadioShack Corp.*, 175 Ohio App.3d 257, 2008-Ohio-1511, ¶ 15 (10th Dist.), citing 15 U.S.C. 1681o(a). "If noncompliance is willful, the affected consumer is entitled to recover actual damages or statutory damages between $100 and $1,000, punitive damages as the court allows, plus the costs of the action and reasonable attorney fees." *Id.*, citing 15 U.S.C. 1681n.

{¶15} "In order to protect consumers from the harm that can result when inaccurate information is disseminated into their credit reports, the FCRA prescribes specific duties on three types of entities: (1) consumer reporting agencies; (2) users of consumer reports; and (3) furnishers of information to consumer reporting agencies." *Johnson v. Keybank*, 8th Dist. Cuyahoga No. 100118, 2014-Ohio-120, ¶ 14. "Under the FCRA, those who furnish information to consumer reporting agencies have two obligations: (1) to provide accurate information; and (2) to undertake an investigation upon receipt of a notice of dispute regarding credit information that is furnished." *Downs v. Clayton Homes, Inc.*, 88 Fed.Appx. 851, 853 (6th Cir.2004), citing 15 U.S.C. 1681s-2. "The FCRA 'creates a private right of action' for consumers to enforce the requirement under § 1681s-2(b) that furnishers of information investigate upon receiving

notice of a dispute, but not the requirement under § 1681s-2(a) that furnishers of information initially provide accurate information to consumer reporting agencies." *Scott v. First S. Natl. Bank*, 936 F.3d 509, 517 (6th Cir.2019).

{¶16} In his amended complaint, plaintiff claims that defendant, a furnisher of information to a consumer reporting agency (CRA), violated its duties under 15 U.S.C. 1681s-2(b).  "Under this section, a furnisher of information who has received notice of a dispute from a CRA is required to: '(1) investigate the disputed information; (2) review all relevant information provided by the CRA; (3) report the results of the investigation to the CRA; (4) report the results of the investigation to all other CRAs if the investigation reveals that the information is incomplete or inaccurate; and (5) modify, delete, or permanently block the reporting of the disputed information if it is determined to be inaccurate, incomplete, or unverifiable.'"  *Llewellyn v. Allstate Home Loans, Inc.*, 711 F.3d 1173, 1178 (10th Cir.2013), quoting *Pinson v. Equifax Credit Information Servs., Inc.*, 316 Fed.Appx. 744, 750 (10th Cir.2009).

**ANALYSIS**

{¶17} Upon review of the evidence presented at trial, the magistrate finds as follows.  Beginning in April 2013, plaintiff was required to make payments to the state's centralized child support payment system in the amount of $510 per month, representing his $500 monthly child support obligation plus a two-percent administrative fee of $10.  During the month of April 2013, plaintiff failed to make any payment and thus went into arrears.  As set forth in the Payment History Report for plaintiff's child support account, plaintiff began making payments the following month, but he continued to owe arrears as a result of his failure to make any payment in April 2013. (Defendant's Ex. B.)  A notice was issued to plaintiff on or about May 16, 2013, informing him that he was "in default of [his] support order" and giving him an opportunity to be heard if he wished to challenge that determination; the notice also stated that potential enforcement actions to collect the arrearage included "Reporting

your arrearage account to a credit-reporting agency." Plaintiff did not request a hearing and remained in arrears. Beginning in July 2013, pursuant to agency policy, the $10 administrative fee that plaintiff owed each month was redirected to pay down the arrears owed to plaintiff's ex-wife.

{¶18} On December 31, 2013, SETS made an automated notification to Equifax to report that plaintiff was in arrears in the amount of $503.09; thereafter, Equifax's automated system periodically reviewed the status of plaintiff's child support account in SETS. On February 4, 2014, plaintiff's ex-wife came to RCCSEA and signed an affidavit stating that plaintiff had made direct payments to her in the amount of $430 and was current in his child support obligation as of January 31, 2014. Consequently, plaintiff's arrears were reduced by $430. Plaintiff remained in arrears, however, due to unpaid administrative fees.

{¶19} Plaintiff subsequently initiated disputes through Equifax concerning information about his child support account that appeared on his credit report. As set forth in the court's entry of January 11, 2018, the disputes at issue were initiated in March and November of 2016. In these disputes, plaintiff contended that he had never been in arrears and asked that "the inaccurate information be corrected to reflect that the account was never delinquent and be removed from 'Negative Account' status on my credit report." (Plaintiff's Ex. 1, p. 6.) RCCSEA Director Brock investigated and reviewed each of the disputes and verified to Equifax that the disputed information was correct.

{¶20} As set forth in the court's entry of April 8, 2019, at issue for trial were plaintiff's claims arising from the February 2014 and May 2014 account information furnished to Equifax. Plaintiff's Equifax credit report indicated that his account was in arrears during the months of February 2014 and May 2014, and plaintiff has failed to show that that information was inaccurate. Rather, as documented in the Payment History Report, and as Brock testified, plaintiff was in arrears during those months

because of unpaid fees. (Defendant's Ex. B.) Since plaintiff did not show that there was any inaccurate or incomplete information for which defendant had a duty to remedy, plaintiff cannot prevail on his claim because "a threshold showing of inaccuracy or incompleteness is necessary in order to succeed on a claim under § 1681s-2(b)." *Pittman v. Experian Information Solutions, Inc.*, 901 F.3d 619, 629 (6th Cir.2018); *see also Chandler v. Peoples Bank & Trust Co. of Hazard*, 769 Fed.Appx. 242, 248 (6th Cir.2019).

{¶21} Plaintiff argued that defendant had a duty to delete from his credit report the "CA" symbol, meaning "Collection Account" in Equifax's Payment History Key, from his payment history for the months of February 2014 and May 2014, and he also argued that defendant had a duty to delete from his credit report a comment stating: "Customer has now located consumer." The evidence fails to show that defendant reported to Equifax that plaintiff had a "collections account" nor that he had to be "located" in any manner. To the contrary, the uncontroverted testimony of Brock, who has ten years of experience reviewing disputes with Equifax, was that this information was generated by Equifax and was not reported by SETS. Moreover, rather than disputing this information, plaintiff was disputing the fact that he was in arrears. (Plaintiff's Ex. 1, p. 6.)

{¶22} Plaintiff also argued that he never should have been reported to Equifax in the first place because, in his view, he was not in "default." According to plaintiff, even though he owed arrears in an amount equal to or greater than his $500 monthly child support obligation when he was reported to SETS, he was not in "default" as defined in R.C. 3121.01(B) and therefore should not have been reported because his arrears at the time ($503.09) were less than his $510 total monthly obligation, representing the monthly child support and the $10 administrative fee. The issues relevant to plaintiff's claims under the FCRA, however, ultimately concern whether there was any duty on defendant's part to modify or delete any disputed information in plaintiff's credit report

that was determined to be inaccurate or incomplete. As previously stated, plaintiff did not make the threshold showing of inaccuracy or incompleteness necessary to succeed on his claims.

{¶23} Based on the foregoing, the magistrate finds that plaintiff failed to prove his claim by a preponderance of the evidence. Accordingly, judgment is recommended in favor of defendant.

{¶24} *A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i). If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed. A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

ROBERT VAN SCHOYCK
Magistrate

**Filed January 29, 2020**
**Sent to S.C. Reporter 2/21/20**